**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

CHRISTOPHER MILLS,

> Plaintiff,

v.                                                    CIVIL ACTION NO.   2:25-cv-00039

IMPERIUM INSURANCE COMPANY, LLC,

> Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant Imperium Insurance Company, LLC's ("Imperium") Motion to Dismiss.  (ECF No. 110.)  For the reasons discussed herein, the motion is **GRANTED**.

**I.      BACKGROUND**

This matter arises out of an insurance dispute.  According to the Complaint, Plaintiff Christopher Mills ("Plaintiff") is the President and Founder of Newseam Holdings, LLC ("Newseam").  (ECF No. 1-1 at 5, ¶ 1.)  Plaintiff obtained a commercial general liability insurance policy (the "Policy") from Defendant Imperium for Newseam's coal mining activities in West Virginia.[1]  (*See id.* at 6, ¶ 7; *id.* at 7, ¶ 10.)  Plaintiff claims that the Policy provided "coverage over, *inter alia*, 'personal and advertising injury,' that occurs on the insured premises

---

[1] The Policy named Newseam and Warrior Energy Resources, LLC as insureds (collectively, the "Insured").  (*See* ECF No. 110-2.)

1

during the period commencing December 18, 2023, and ending on December 18, 2024." (*Id.* at 7, ¶ 11.)

Plaintiff and Newseam were subsequently sued.[2]  (*Id.* at 7–8, ¶¶ 12–20.)  Next Technology Energy, LLC ("NTE") filed the underlying complaint (the "Lawsuit") in the Circuit Court of Kanawha County, West Virginia, on March 26, 2024.  (ECF No. 110-1.)  The underlying complaint asserts claims for tortious interference with a contract, slander of title, and conspiracy in restraint of trade against Plaintiff and Newseam, among others.  (*Id.* at 10–14.)

To support those claims, the underlying complaint alleges that NTE "executed Membership Interest Purchase Agreement ('MIPA')" with Greenbrier Minerals, LLC, Coronado Coal, LLC, and Coronado Coal Corporation (collectively, "Coronado").[3]  (*Id.* at 1, ¶ 1.)  The MIPA evidently "obligate[d] Coronado to sell all the membership interests . . . of certain Coronado subsidiaries . . . to NTE."  (*Id.* at 2, ¶ 2.)  In particular, one of the Coronado subsidiaries, Matoaka Land Company, LLC ("Matoaka"), allegedly holds a lessee's interest in a very coveted coal mining lease ("Matoaka Lease").  (*Id.*, ¶¶ 4–6.)

Highland Mineral Resources, LLC ("Highland")[4] was the lessor of the Matoaka Lease. (*Id.*, ¶ 7.)  Supposedly, Highland was also negotiating with NTE to sell, *inter alia*, its lessor's interest to NTE.  (*Id.*, ¶ 9.)  Between the two deals, NTE would own both the lessor and lessee interests in the Matoaka Lease.

---

[2] Although Plaintiff provides a thorough explanation of his side of the story, the Court must look to the allegations in the underlying complaint in order to determine whether there is coverage under the Policy, as discussed more thoroughly below.

[3] The Coronado defendants are named defendants in the present action.  (*See* ECF No. 1.)

[4] Highland was originally named a defendant in the present action, (*see* ECF No. 1), but was later terminated after it agreed to be bound by any orders, judgments, or verdicts concerning the existence or scope of insurance coverage in this case, (*see* ECF Nos. 23, 24).

However, at the same time, Highland was evidently negotiating to sell its lessor interest to Newseam. (*Id.* at 3, ¶ 10.) Ultimately, Highland's deal with Newseam prevailed. (*Id.*, ¶ 11.) Thus, Newseam acquired the lessor interest in the Matoaka Lease.

The underlying complaint insinuates that Plaintiff and Newseam wanted more, though. Like NTE, Plaintiff supposedly also wanted the lessee interest in the Matoaka Lease. (*See id.*, ¶ 12.) To bring this about, NTE claims that Plaintiff and Newseam attempted to cause Coronado to sell its subsidiaries and/or their assets, including the Matoaka Lease, to Newseam, instead of NTE. (Id., ¶ 13.) Specifically, Plaintiff allegedly approached Coronado and "falsely assert[ed] the Matoaka Lease ha[d] expired." (*Id.*, ¶ 14; *id.* at 8, ¶ 50 ("[A]fter representing to third-parties that the Matoaka Lease was in full force and effect . . . Highland, upon information and belief in concert with and at the direction of [Plaintiff] and Newseam, published the false assertion to Coronado that the Matoaka Lease had automatically expired."); *id.*, ¶ 51 ("Newseam, upon the direction or ratification of [Plaintiff], sent Coronado a letter asserting that the Matoaka Lease was no longer in force and effect.").) The letter from Newseam to Coronado was described as "very aggressive and uninformed." (*Id.*, ¶ 52.)

As a result of the Lawsuit, Newseam made a claim under the Policy on November 18, 2024. (ECF No. 1-1 at 9, ¶ 36.) After some back and forth, (*see id.* at 10–12, ¶¶ 32–50), Defendant Imperium disclaimed any obligation to defend or indemnify Newseam in the Lawsuit. (*Id.*, ¶ 51.) The reason Defendant Imperium purportedly provided was that the Policy contains certain exclusions, which Defendant Imperium believes covered the Lawsuit's claim regarding the alleged false statement concerning the lease. (*See id.* at 14–15, ¶ 56–57.)

Consequently, Plaintiff initiated this matter in the Circuit Court of Kanawha County, West Virginia on December 16, 2024. (*See generally id.*) The Complaint seeks declaratory judgment determining the applicability of the Policy. (*Id.* at 21–22, ¶ 77.) Specifically, Plaintiff seeks declaratory judgment that Defendant Imperium's right and duty to defend have been triggered,[5] as well as a court order requiring Defendant Imperium to reimburse Plaintiff for the cost of defense to date. (*See id.*) Plaintiff also asks the Court to determine the Insured's "rights, liabilities, obligations and duties" concerning Defendant Imperium's alleged failure to meet its obligation to defend under the Policy. (*Id.*)

Defendant Imperium removed this matter to federal court on January 22, 2025. (ECF No. 1.) A few motions were subsequently filed. (*See, e.g.*, ECF No. 41 (motion to bifurcate and stay discovery); ECF No. 50 (motion to dismiss); ECF No. 54 (motion for leave to file amended complaint).) However, during a telephonic status conference on June 17, 2025, the Court explained that the threshold issue of the duty to defend had not yet been adequately teed up. (*See* ECF No. 102.)

In response, Defendant Imperium filed the pending motion[6] on November 24, 2025, which argues, without relying on any exclusions, that it has no duty to defend or indemnify Plaintiff because the allegations in the Lawsuit do not fall within the coverage of the Policy. (*See* ECF Nos. 110, 111.) Plaintiff filed a response, (ECF No. 112), and Defendant Imperium filed a reply, (ECF No. 115).[7]

---

[5] Plaintiff also asks the Court to "waive" Defendant Imperium's "duty to defend while retaining its right to defend under the Policy and reservation of rights based on the suit's expected process," "[d]eclare the Plaintiff solely accountable for its defense," reimburse Plaintiff with costs associated with this matter, a reservation of Plaintiff's rights to pursue additional damages, and a stay in the Lawsuit. (*See* ECF No. 1-1 at 21 – 22, ¶ 77.)

[6] Defendant Imperium previously filed a Motion for Summary Judgment, asserting the same arguments, (*see* ECF No. 103), which was denied as premature, (ECF No. 109).

[7] Coronado also filed a response, (ECF No. 114), to which Defendant Imperium replied, (ECF No. 116). The

4

As such, this motion is fully briefed and ripe for adjudication.

## II.   *LEGAL STANDARD*

A motion to dismiss for failure to state a claim upon which relief may be granted tests the legal sufficiency of a civil complaint.   Fed. R. Civ. P. 12(b)(6).   A plaintiff must allege sufficient facts, which, if proven, would entitle him to relief under a cognizable legal claim.   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–55 (2007).   A case should be dismissed if, viewing the well-pleaded factual allegations in the complaint as true and in the light most favorable to the plaintiff, the complaint does not contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.   In applying this standard, a court must utilize a two-pronged approach.   First, it must separate the legal conclusions in the complaint from the factual allegations.   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   Second, assuming the truth of only the factual allegations, the court must determine whether the plaintiff's complaint permits a reasonable inference that "the defendant is liable for the misconduct alleged."   *Id.*   Well-pleaded factual allegations are required; labels, conclusions, and a "formulaic recitation of the elements of a cause of action will not do."   *Twombly*, 550 U.S. at 555; *see also King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) ("Bare legal conclusions 'are not entitled to the assumption of truth' and are insufficient to state a claim." (quoting *Iqbal*, 556 U.S. at 679)).   A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," thereby "nudg[ing] [the] claims across the line from conceivable to plausible."   *Twombly*, 550 U.S. at 555, 570.

---

Coronado response requests that the Court enter an order that only affects "the rights and obligations of Plaintiff Mills and Defendant Imperium" because the Coronado Defendants' "involvement in this case presents jurisdictional issues" which may implicate "an advisory opinion."   (*See* ECF No. 114 at 2.)   The Court agrees.   No party argues that the Coronado Defendants were an insured, (*see generally* ECF Nos. 110–116), nor can they.   (*See* ECF No. 110-2 (only identifying Newseam and Warrior Energy Resources, LLC as insureds under the Policy).)   Accordingly, the Court's order will only affect the rights and obligations of Plaintiff and Defendant Imperium.

### III.   DISCUSSION

Under West Virginia law,[8] language in an insurance policy should be given its "plain, ordinary meaning."   Syl. Pt. 8, *Cherrington v. Erie Ins. Prop. & Cas. Co.*, 745 S.E.2d 508, 511 (W. Va. 2013) (citations omitted).; *Nationwide Mut. Ins. Co. v. Hatfield*, 2005 WL 2978046, *2 (S.D. W. Va. Nov. 7, 2005) ("In examining language of an insurance policy, words and phrases are to be given their 'plain, ordinary meaning unless they are specifically defined in the policy.'") (citation omitted).   If, after giving the language its customary meaning, the provisions in an insurance policy "are plain and unambiguous and where such provisions are not contrary to a statute, regulation, or public policy, the provisions will be applied and not construed."   Syl. Pt. 1, *Kelly v. Painter*, 504 S.E.2d 171, 172 (W. Va. 1998).   Whether a contract is ambiguous is a question of law.   Syl. Pt. 4, *Blake v. State Farm Mut. Auto. Ins. Co.*, 685 S.E.2d 895, 897 (W. Va. 2009) (noting "[t]he mere fact that parties do not agree to the construction of a contract does not render it ambiguous").   Courts must give full effect to the plain meaning of clear and unambiguous insurance policy contract provisions.   *Id.* at Syl. Pt. 2.   If, on the other hand, a provision is ambiguous, courts are to construe it "against the drafter, especially when dealing with exceptions and words of limitation."   *Boggs v. Camden-Clark Mem'l Hosp. Corp.*, 693 S.E.2d 53, 58 (W. Va. 2010) (quotations and citations omitted); *First Mercury Ins. Co., Inc. v. Russell*, 806 S.E.2d 429, 435–36 (W. Va. 2017) (stating, "[w]here the policy language involved is exclusionary, it will be strictly construed against the insurer in order that the purpose of providing indemnity not be defeated.").

---

[8] In cases grounded in diversity jurisdiction, a federal court is "obliged to apply the substantive law of the state in which it sits."   *Volvo Constr. Equip. N. Am. v. CLM Equip. Co., Inc*., 386 F.3d 581, 599–600 (4th Cir. 2004) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 79 (1938)).

An ambiguous policy provision is one "reasonably susceptible of two different meanings or of such doubtful meaning that reasonable minds might be uncertain or disagree as to its meaning." Syl. Pt. 3, *Glen Falls Ins. Co. v. Smith*, 617 S.E.2d 760 (W. Va. 2005). This liberal construction, however, "should not be unreasonably applied to contravene the object and plain intent of the parties." *Id.* at Syl. Pt. 4 (citation omitted). A court is "obligated to give an insurance contract that construction which comports with the reasonable expectations of the insured." *Burr v. Nationwide Mut. Ins. Co.*, 359 S.E.2d 626, 631 (W. Va. 1987); *Glen Falls Ins. Co.*, 617 S.E.2d at 768 ("The standard is that of what a reasonable person standing in the shoes of the insured would expect the language to mean.").

In cases involving a determination of the scope of insurance coverage, the insured "bears the burden of establishing a prima facie case that the claim falls within the scope of coverage. Once a prima facie case has been established, the burden shifts to the insurer to demonstrate that an exclusion applies." *Runion v. Minnesota Life Ins. Co.*, 2013 WL 2458541, *2 (S.D. W. Va. June 6, 2013) (internal citation omitted). Once the burden shifts, the insurance company "seeking to avoid liability through the operation of an exclusion has the burden of proving the facts necessary to the operation of that exclusion." *State ex rel. Nationwide Mut. Ins. Co. v. Wilson*, 236, 778 S.E.2d 677, 685 (W. Va. 2015) (citing Syl. Pt. 7, *Nat'l Mut. Ins. Co. v. McMahon & Sons, Inc.*, 356 S.E.2d 488 (W. Va. 1987)).

The Policy at issue here provides Plaintiff coverage under two separate insuring agreements pertinent to this litigation: Coverage A (Bodily Injury and Property Damage Liability) and Coverage B (Personal and Advertising Injury). (ECF No. 110-2 at 25–31.) Each insuring

7

agreement has a general aggregate limit of $2,000,000, a personal and advertising injury limit of

$1,000,000, and a $1,000,000 limit for each occurrence.   (*Id.* at 21.)

Without relying on any exclusions, Defendant Imperium avers that it does not owe a duty

to defend under either Coverage A or B.   (*See generally* ECF Nos. 111, 115.)   Conversely,

Plaintiff claims that Defendant Imperium has a duty to defend under both Coverage A and

Coverage B.[9]   (*See* ECF No. 112 at 5–14.)   Both Coverage A and B are discussed in turn below.

### A.  Scope of Inquiry

As an initial matter, the parties disagree on what must be considered to determine whether

Defendant Imperium has a duty to defend.   (*See* ECF Nos. 112 at 114–20; 115 at 16–19.)   The

Supreme Court of Appeals of West Virginia ("WVSCA") has described the standard for

determining whether an insurance company has a duty to defend an insured as follows:

> An insurance company's duty to defend an insured is broader than the duty to
> indemnify under a liability insurance policy. An insurance company has a duty to
> defend an action against its insured if the claim stated in the underlying complaint
> could, without amendment, impose liability for risks the policy covers. If, however,
> the causes of action alleged in the plaintiff's complaint are entirely foreign to the
> risks covered by the insurance policy, then the insurance company is relieved of its
> duties under the policy.

*Bowyer v. Hi–Lad, Inc.*, 609 S.E.2d 895, 912 (W. Va. 2004).   As a general rule, courts are to

consider whether the allegations in the underlying complaint against the insured are "reasonably

---

[9] Plaintiff also argues that the Court should deny Defendant Imperium's motion for failure to follow the Court's instruction to file a partial motion to dismiss on the duty to defend.  (ECF No. 112 at 2.)   The Court has been clear, though, that the threshold issue of the duty to defend may have an effect in resolving other issues in this case.  (*See* ECF No. 102.)   By noting that a partial motion to dismiss on this issue alone would suffice, the Court only sought to dissuade the parties from re-briefing additional issues already before the Court.  (*See, e.g.*, ECF No. 50 (motion to dismiss on other grounds).)   Defendant Imperium's request for dismissal with prejudice based only on the duty to defend is well within the scope of the Court's order.  (*See* ECF No. 109 at 2 (ordering Defendant Imperium to file an appropriate motion to dismiss on the duty to defend).)   Plaintiff did not file a motion for sanctions with a separate memorandum of law in support, as required by the local rules, *see* L.R. Civ. P. 7.1(a)(2), but, to the extent that he intended to so move, any motion for sanctions is **DENIED**.

susceptible of an interpretation that the claim may be covered by the terms of the insurance policy." Syl. pt. 4, *Tackett v. Am. Motorists Ins. Co.*, 584 S.E.2d 158, 158–60 (W. Va. 2003) (internal quotation marks and citations omitted); *see also* Syl. pt., *Farmers & Mechs. Mut. Fire Ins. Co. of W. Va. v. Hutzler*, 447 S.E.2d 22 (W. Va. 1994) ("When a complaint is filed against an insured, an insurer must look beyond the bare allegations contained in the third party's pleadings and conduct a reasonable inquiry into the facts" to determine "whether the claims asserted may come within the scope of the coverage that the insurer is obligated to provide."). An insurer must defend all claims against the insured if any claims fall within the policy coverage. *Tackett*, 584 S.E.2d at 529; *Horace Mann Ins. Co. v. Leeber*, 376 S.E.2d 581, 584 (W. Va. 1988) (citing *Donnelly v. Transp. Ins. Co.*, 589 F.2d 761, 765 (4th Cir. 1978)). Further, "[a]ny question concerning an insurer's duty to defend under an insurance policy must be construed liberally in favor of an insured where there is any question about an insurer's obligations." *Id.* at syl. pt. 5.

In this case, Plaintiff insists that, to determine whether Defendant Imperium has a duty to defend, the Court should deviate from "the 'normal' or 'general' rules," consider extrinsic evidence, and allow the parties to engage in discovery. (ECF No. 112 at 14–20.) Plaintiff reasons that the extrinsic evidence would disprove the allegations of false statements concerning the Matoaka Lease, (*id.* at 18–19), and, without its consideration, Plaintiff would be "in the impossible position of proving a negative," (*id.* at 15) (comparing this task to "disproving the existence of Bigfoot or the Loch Ness Monster"). For support, Plaintiff analogizes the present facts to those discussed in the WVSCA's decisions in *Hutzler* and *Farmers & Mechanics Mut. Ins. Co. of W. Virginia v. Cook*, 557 S.E.2d 801 (W. Va. 2001). (*See id.* at 16–18.) However, as

9

Defendant Imperium points out, Plaintiff's reliance on those cases is misplaced.  (*See* ECF No. 115 at 16–19.)  Each case is discussed in turn below.

### 1. Hutzler

In *Hutzler*, a lawsuit for allegedly selling alcoholic beverages to an underage purchaser was filed against the insured, among others.  447 S.E.2d at 23.  Specifically, the underlying complaint alleged that the insureds "knew or reasonably should have known that [a codefendant] . . . sold beer and/or liquor to underage individuals, in violation of West Virginia state law."  *Id.* The insureds submitted the claim to their insurance company, which filed a declaratory judgment action to determine its duties and responsibilities toward covering and defending under the applicable commercial liability insurance policy.  *Id.* at 23–24.

The circuit court granted summary judgment in favor of the insurance company because "there [was] no potential liability that arguably comes within the scope of the insurance coverage," as the alleged violation, if contrary to *statute*, was excluded from coverage under the policy.  *Id*. at 24.    The circuit court also concluded that the insurance company did not have to investigate the claim because, "if the claim set forth in the complaint against the insured is one which is expressly excluded by the policy provisions, the insurer need not undertake the defense of the insured."  *Id.*

The insured raised two issues on appeal.  First, they contended that the trial court erred when it concluded that the insurance company owed no duty to investigate the factual basis upon which it claimed an exclusion under the policy.  *Id.*  Second, they argued that the alleged violation of "West Virginia state law" was not limited to violation of a statute, ordinance or regulation, but could also include causes of action derived from the common law.  *Id.*  For

support, the insureds also asserted that "in sworn discovery documents on file, the [plaintiffs] contend that the appellants violated a common law duty and 'engaged in an affirmative act which created an unreasonable risk of harm to another . . . .'" *Id.*   For this reason, the insureds argued that the insurance company "had a duty to look beyond the bare allegations contained in the complaint to determine whether there is a duty to defend and indemnify the appellants in this action." *Id.*

The WVSCA agreed that the circuit court ignored a potential common law theory of recovery. *Id.* at 25 (holding that the insurer "was wrong to deny coverage to the [insured] without assessing the avenues for recovery under the *common law* that [may be] pursue[d]").   The WVSCA specifically noted that, while "the pleadings [were] rather ambiguous in regard to the type of tortious conduct that [wa]s being alleged," the general allegations of negligence, *i.e.*, that the insureds knew or should have known that a codefendant was selling alcohol to minors, was "directed at all of the defendants under common law theories related to negligence, which might then fall within the insurance protection provided by the [] policy." *Id.*

*At no point* did the WVSCA mention or consider any documents or statements outside the four corners of the underlying complaint in coming to this conclusion. *See generally id.* Nevertheless, it concluded with the following rule:

> When a complaint is filed against an insured, an insurer must look beyond the bare allegations contained in the third party's pleadings and conduct a reasonable inquiry into the facts in order to ascertain whether the claims asserted may come within the scope of the coverage that the insurer is obligated to provide.

*Id.* at 25.   While Plaintiff points to this rule for the proposition that an insurance company must look beyond the allegations in the underlying complaint to determine coverage, the WVSCA later acknowledged that *Hutzler* was a little awry:

11

> It should be noted, however, that the opinion in *Hutzler* was rather attenuated and did not cite this Court's earlier decisions in [*Horace Mann Insurance v. Leeber*, 376 S.E.2d 581 (W. Va. 1988)] and [*Aetna Casualty & Surety Co. v. Pitrolo*, 342 S.E.2d 156 (W. Va. 1986)], *supra*. Nor did *Hutzler* discuss the standard expressed in those cases that "an insurer's duty to defend is *normally* tested by whether the *allegations in the complaint* against the insured are reasonably susceptible of an interpretation that the claim may be covered by the terms of the insurance policy." *Leeber*, supra, 180 W.Va. at 378, 376 S.E.2d at 584. (emphasis added).

*Bruceton Bank v. U.S. Fid. & Guar. Ins. Co.*, 486 S.E.2d 19, 25–26 (W. Va. 1997) (reasoning that "[t]he mandate of *Hutzler* to 'conduct a reasonable inquiry into the facts' behind the allegations of the complaint . . . effectively constitute[s] an overstatement of the [] standard set forth in *Leeber* and *Pitrolo*).[10]

The WVSCA has since been clear that an insurance company only has to look to the allegations in the underlying complaint. *See, e.g.,* Syl. Pt. 3, *in part*, *id.* at 19 ("[I]ncluded in the consideration of whether the insurer has a duty to defend is whether the allegations in the complaint . . . are reasonably susceptible of an interpretation that the claim may be covered by the terms of the insurance policies."); Syl. Pt. 5, *W. Va. Fire & Cas. Co. v. Stanley*, 602 S.E.2d 483 (W. Va. 2004); *State ex rel. Nationwide Mut. Ins. Co. v. Wilson*, 778 S.E.2d 677, 685 (W. Va. 2015); *Tritapoe v. Old Republic Nat'l Title Ins. Co.*, No. 19-0100, 2020 WL 1487813, at *5 (W. Va. Mar. 23, 2020). "In other words, an insurer has a duty to defend an action against its insured only if the claim stated in the underlying complaint could, without amendment, impose liability

---

[10] In *Pitrolo*, the WVSCA established the following standard:

> [A]n insurer's duty to defend is normally tested by whether the allegations in the complaint against the insured are reasonably susceptible of an interpretation that the claim may be covered by the terms of the insurance policy. Consequently, there is no requirement that the facts alleged in the complaint against the insured specifically and unequivocally delineate a claim which, if proved, would be within the insurance coverage.

342 S.E.2d at 160; *see also Leeber*, 376 S.E.2d at 584 (discussing *Pitrolo*).

12

for risks the policy covers." *State Auto. Mut. Ins. Co. v. Alpha Eng'g Servs., Inc.*, 542 S.E.2d 876, 879 (W. Va. 2000) (collecting cases). Thus, *Hutzler* did not create a new rule of law requiring insurance companies to investigate the *merits* of the underlying claims.

As such, *Hutzler* does not support Plaintiff's contention that Defendant Imperium should have considered extrinsic evidence that would undermine the allegations in the Lawsuit.

### 2. Cook

In *Cook*, a couple was sued for wrongful death after the wife shot and killed a third-party aggressor in defense of her husband. 557 S.E.2d at 803. The couple had a homeowners insurance policy and gave notice to the insurance company. *Id.* Even though the insurance company did not contest that the homeowners acted in self-defense, it nevertheless refused to defend the couple due to the "intentional acts" exclusion in the policy. *Id.*; *see also id.* at 805 (discussing a WVSCA decision, which predated the wrongful death lawsuit, finding the wife not guilty of second-degree murder because she acted in self-defense of her husband). Specifically, the policy excluded coverage for "bodily injury or property damage . . . which is expected or intended by the insured." *Id.* at 805.

After discovery, the circuit court granted summary judgment in favor of the insurance company. *Id.* The circuit court reasoned that the wife expected and intended to shoot the third-party aggressor. *Id.* at 805. In fact, the circuit court held that it could be inferred that the wife expected and intended to cause the third-party aggressor bodily injury because whether a policyholder intends to cause harm to another is viewed from an *objective* viewpoint. *Id.* "In other words, the circuit court concluded that a reasonable, prudent person would expect that firing a shotgun at another person would cause bodily injury—regardless of what [the wife] contended

13

her intentions and expectations truly were." *Id.* Thus, the circuit court held that the insurance company had no duty to defend the couple. *Id.*

On appeal, the WVSCA provided the general rule from *Hutzler* that the insurer must conduct a "reasonable inquiry into the facts." *Id.* at 806. However, the WVSCA then provided rules that specifically apply to an insurance policy's intentional acts exclusion. *Id.* at 807 ("Courts are generally in agreement that under an intentional acts exclusion, 'a policyholder may be denied coverage only if the policyholder (1) committed an intentional act *and* (2) expected or intended the specific resulting damage.'" (quoting *State ex rel. Davidson v. Hoke*, 532 S.E.2d 50, 57 (W. Va. 2000)). In particular, in determining whether an intentional acts exclusion applies, "courts generally look to the *subjective* intent of the policyholder." *Id.* (emphasis added). Applying the special rules that relate to an intentional acts exclusion, the WVSCA held that "the facts are reasonably susceptible of an interpretation that the claim is not precluded by the intentional acts exclusion and may be covered by the terms of the insurance policy, such that the Cooks are entitled to a legal defense." *Id.* at 810.

Thus, while Plaintiff relies on *Cook* in arguing that the Court should consider evidence relevant to the duty to defend, (ECF No. 112 at 16–18), Defendant Imperium correctly notes that it did not deny coverage based on an intentional acts exclusion, (ECF No. 115 at 17). As such, the rules discussed in *Cook* requiring courts to look beyond the four corners of the underlying complaint and determine the subjective intent of the policyholder are inapplicable in this matter.

Therefore, the Court will not deviate from the "'normal' or 'general' rules" or consider extrinsic evidence. Instead, the Court will consider whether the allegations in the underlying complaint—only—are "reasonably susceptible of an interpretation that the claim may be covered

14

by the terms of the insurance policy." *Tackett*, 584 S.E.2d at 158–60 (internal quotation marks and citations omitted).

### B. Coverage A

Coverage A in the Policy applies to "bodily injury"[11] or "property damage" caused by an "occurrence." (*See* ECF No. 110-2 at 25.) Property damage is defined as "[l]oss of use of tangible property that is not physically injured," which occurs "at the time of the 'occurrence' that caused it."[12] (*Id.* at 39.) Occurrence is defined as "an accident." (*Id.*) While not defined in the Policy, the term "accident" in the context of insurance policies has been defined as "a chance event or event arising from unknown causes." *W. Va. Fire & Cas. Co. v. Stanley*, 602 S.E.2d 483, 492 (W. Va. 2004). Similarly, while not defined in the Policy, the phrase "tangible property" is generally defined[13] as "[p]roperty that has physical form and characteristics," which "can be seen, weighed, measured, felt, touched, or in any other way perceived by the senses." *See Property, Black's Law Dictionary* (12th ed. 2024).

Here, Defendant Imperium does not have a duty to defend under Coverage A because the allegations in the Lawsuit do not describe "property damage." Plaintiff reasons, without any legal support, that the Lawsuit asserts a claim for "property damage" because NTE alleges that Plaintiff deprived it of the use and purchase of the Matoaka Lease. (*See* ECF No. 112 at 5–7.) However, Plaintiff's attempt to recharacterize the alleged injury in the Lawsuit as "property damage" fails

---

[11] It is undisputed that there was no "bodily injury." (*See, e.g.*, ECF Nos. 111 at 14, n.7; 115.)

[12] Property damages is also defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property," which occurs "at the time of the physical injury that caused it." No parties contends that there was physical injury to property. (See ECF Nos. 110–116.)

[13] "As a general rule, [West Virginia courts] accord the language of an insurance policy its common and customary meaning." *Boggs v. Camden-Clark Mem'l Hosp. Corp.*, 693 S.E.2d 53, 57–58 (W. Va. 2010); *Horace Mann Ins. Co. v. Adkins*, 599 S.E.2d 720, 724 (W. Va. 2004) ("Language in an insurance policy should be given its plain, ordinary meaning." (internal quotations and citation omitted)).

because Plaintiff describes an injury to an intangible—rather than tangible—property right and economic interest.   *Cf. Property, Black's Law Dictionary* (12th ed. 2024); *see also Cmty. Antenna Servs., Inc. v. Westfield Ins. Co.*, 173 F. Supp. 2d 505, 511 (S.D. W. Va. 2001) (Haden, J.) (explaining that intangible or "incorporeal property" is "that which consists in legal rights merely" that "the mind alone can perceive").   Indeed, the Lawsuit alleges that Plaintiff caused NTE "significant harm . . . as the prospective purchaser" of the Matoaka Lease, which resulted in "lost profits" and "lost economic opportunities," and a "diminution in the value of [NTE's] prospective ownership interest."   (ECF No. 110-1 at 12–14, ¶¶ 75, 79, 86–88, 92–93.)   To that extent, this Court has held that such economic injuries do not "satisfy the definition of 'property damage' because such damage requires 'physical injury to' or 'loss of use of tangible property.'"[14] *Cooper v. Westfield Ins. Co.*, 488 F. Supp. 3d 430, 439 (S.D. W. Va. 2020) (Johnston, C.J.); *see also Westfield Ins. Co. v. White*, 19 F. Supp. 2d 615, 617 (S.D. W. Va. 1998) (Haden, C.J.) (holding that purely economic losses are not tangible property and, therefore, are not covered as "property damage"); *Uncork & Create LLC v. Cincinnati Ins. Co.*, 498 F. Supp. 3d 878, 882 (S.D. W. Va. 2020) (Berger, J.), *aff'd*, 27 F.4th 926 (4th Cir. 2022) (holding that recovery for "lost business without any accompanying repairs to the premises" is "purely economic" and thus not covered as "property damage").

Therefore, because the Lawsuit does not allege any property damage,[15] as defined by the Policy, Defendant Imperium does not owe Plaintiff a duty to defend under Coverage A.

---

[14] While the land subject to the lease is, unquestionably, tangible property, there can be no loss of use of property that NTE had not yet acquired.   That's nonsense.

[15] The parties also dispute whether Plaintiff's actions constitute an "occurrence."   (*See* ECF Nos. 111 at 15–16; 112 at 8–9.)   However, because the Court determined that there is no duty to defend under Policy A for other reasons, it need not address this argument.

16

### C.  Coverage B

Coverage B in the Policy applies to "'personal and advertising injury' caused by an offense arising out of [Newseam's] business."  (ECF No. 110-2 at 30.)  The Policy defines "personal and advertising injury," in pertinent part, as an "injury . . . arising out of . . . [o]ral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services[.]"  (*Id.* at 39.)  While not defined in the Policy, the verb "slander" generally means to make a defamatory statement that is "said in reference to another."  *See Slander, Black's Law Dictionary* (12th ed. 2024); *see also Defamatory, Black's Law Dictionary* (12th ed. 2024) ("[T]ending to harm a person's reputation."); *Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70, 77 (W. Va. 1983) (holding that statement may be described as defamatory "if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him").  Similarly, the verb "libel" is generally means "[t]o defame (someone) in a permanent medium, esp. in writing." *Libel, Black's Law Dictionary* (12th ed. 2024); *see also* Syl. Pt. 8, *Greenfield v. Schmidt Baking Co.*, 485 S.E.2d 391, 394 (W. Va. 1997) (providing that, under West Virginia law, defamation published in written form constitutes libel).

At bottom, slander and libel require a false statement about another person that will tend to harm that person's reputation.  Coverage B expands this ordinary meaning to false statements about a person, organization, or a person's or organization's goods, products or services.  (*See* ECF No. 110-2 at 39.)  Thus, allegations encompassing that type of conduct would need to be present in the Lawsuit in order for Defendant Imperium to have a duty to defend under Coverage B.

17

Here, regardless of what specific causes of action are asserted,[16] *see Hutzler*, 447 S.E.2d at 25, the Lawsuit alleges that the Insured made a false statement about a *property interest*.   (*See, e.g.*, ECF No. 110-1 at 3, ¶ 14 (alleging that the Insured "falsely assert[ed] the Matoaka Lease has expired"); *id.* at 8, ¶ 50 ("Highland, upon information and belief in concert with and at the direction of Mills and Newseam, published the false assertion to Coronado that the Matoaka Lease had automatically expired."); *id.*, ¶ 51 ("Newseam, upon the direction or ratification of Mills, sent Coronado a letter asserting that the Matoaka Lease was no longer in force and effect."); *id.*, ¶ 52 (claiming that Newseam's letter was "uninformed regarding the facts and the law surrounding coal leasehold rights in West Virginia").)   Defendant Imperium correctly asserts that the Lawsuit is devoid of any allegations that the Insured slandered or libeled a person, organization, or a person's or organization's goods, products or services.   (*See* ECF No. 111 at 19.)

Conversely, Plaintiff offers that the Lawsuit's allegations "can be viewed as slandering, libeling, or disparaging" (a) "Coronado on the grounds that it is allegedly attempting to sell rights to a lease that expired"; and/or (b) "NTE for attempting to improperly acquire rights to a lease it knows is expired."   (*See* ECF No 112 at 11.)   Both of these theories fail.   As to the first, Coronado is not the plaintiff in the Lawsuit, and NTE cannot sue for defamation on behalf of Coronado.   As to the second, the allegations in the underlying lawsuit are silent as to any injury to NTE's reputation.   Rather, any injury was clearly to NTE's property interest, discussed above.

---

[16] Both parties spill a tremendous amount of ink discussing a claim for slander of title, generally.   (*See* ECF Nos. 111 at 16–19; 112 at 12–13; 115 at 11–14.)   However, as *Hutzler* instructs, the Court will look at whether the allegations in the Lawsuit would offer any "avenues for recovery" that may come within the scope of the coverage that Defendant Imperium is obligated to provide, as opposed to the specific causes of action asserted.   *See* 447 S.E.2d at 25; *see also* ECF No. 112 at 10 (acknowledging that the duty to defend is not "dependent on the precise use of terms within the complaint" (internal citations omitted)).

Still, Plaintiff points to a specific allegation in the Complaint: "By falsely and without any good faith basis asserting that the Matoaka Lease was no longer in effect, Defendant Highland, Christopher Mills, and Newseam maliciously published false statements in derogation of Matoaka's interest under the Matoaka Lease."  (ECF No. 112 at 11 (quoting ECF No. 110-1 at 13, ¶ 85).)   Plaintiff asserts that "Matoaka's interest under the Matoaka Lease," includes "surface mining of more than one million tons of high-quality metallurgical coal," the Matoaka Lease, and "the exclusive right to mine and remove coal from the subject property."  (*Id.* at 12 (citing ECF No. 110-1 at 2, 11, 112, ¶¶ 6, 70, 81).)   From there, Plaintiff claims that the Lawsuit "effectively alleges" that "Matoaka's services include mining coal and administering the [Matoaka] Lease, and its goods and products include the extracted coal as well as the [Matoaka] Lease itself."  (*See id.*) Although Plaintiff does not complete this thought, (*see generally id.*), it appears that the theory is that the Insured's letter libeled Matoaka's services (mining coal and administrating the Matoaka Lease) and its goods/products (extracted coal and the Matoaka Lease).

Plaintiff can rearrange the deck chairs on the Titanic all he wants, but his attenuated interpretation of the Lawsuit is unpersuasive.   The allegation that Plaintiff relies on states that the Insureds made a "false statement *in derogation* of Matoaka's interest under the Matoaka Lease." (ECF No. 110-1 at 13, ¶ 85 (emphasis added).)   Derogation is generally defined as a "depreciation in value."  *Derogation, Black's Law Dictionary* (12th ed. 2024).   Thus, the Lawsuit simply alleges that the Insured's false statements *about the Matoaka Lease* depreciated the value of the interests in said lease, which, according to Plaintiff, are certain services, goods, and products.

Therefore, Defendant Imperium does not have a duty to defend under Coverage B.

19

### D.  *Effect of the Duty to Defend*

In the pending motion, Defendant Imperium asks the Court to dismiss Plaintiff's Complaint "in its entirety with prejudice as it cannot be amended and no other causes of action against Imperium are cognizable" because Defendant Imperium does not have a duty to defend.   (ECF No. 111 at 20.)   Plaintiff argues that this "skeletal argument" ignores the fact that the Court has not ruled on Plaintiff's pending Motion to Amend, (ECF No. 54), and that other claims, such as the statutory bad faith claim, is not dependent on a contractual breach of the Policy or the existence of the duty to defend.   (*See* ECF No. 112 at 3 (also arguing that the statutory bad faith claim is not suitable for a ruling before full discovery because an insurance company's reasonableness is generally a question of fact).)   Conversely, Defendant Imperium retorts that the operative complaint in this action does not include a statutory bad faith claim.   (ECF No. 115 at 2 (noting that Plaintiff's proposed amended complaint contains such a count).)   Defendant Imperium also argues that the proposed amended complaint would be futile.   (*Id.* at 2–3.)

Ultimately, the Court agrees with Defendant.   Plaintiff's proposed amendment would be futile,[17] *inter alia*, because "a court must find that there is coverage before there can be common law [and statutory] bad faith . . . claims against an insurance company."   *Cava v. Nat'l Union Fire Ins. Co.*, 753 S.E.2d 1, 9 n. 6 (W. Va. 2013); *All Risks, Ltd v. Old White Charities, Inc.*, 715 F. App'x 274, 276 (4th Cir. 2017) (relying on *Cava* and rejecting bad faith claims); *Evans v. United Bank, Inc.*, 775 S.E.2d 500, 508 (W. Va. 2015) (recognizing that a common law bad faith claim is

---

[17] "Leave to amend should be denied on the ground of futility when the proposed amendment is clearly insufficient or frivolous on its face."   *Bailey v. Bradford*, 12 F. Supp. 3d 826, 831 (S.D. W. Va. 2014) (quoting *Friend v. Remac Am., Inc.*, 924 F.Supp.2d 692, 696 (N.D. W. Va. 2013)).   "[A]mending the complaint would be futile" if "'the proposed amended complaint fails to satisfy the requirements of the federal rules.'"   *See United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008) (quoting *United States ex rel. Fowler v. Caremark RX, LLC*, 496 F.3d 730, 740 (7th Cir. 2007)).

dependent on the existence of an express breach of contract claim).   Accordingly, Plaintiff's Motion for Leave to Amend, (ECF No. 54), is **DENIED**, and Defendant Imperium's request to have the Complaint dismissed with prejudice in its entirety is **GRANTED**.

### E.  CONCLUSION

For these reasons, Plaintiff's Motion for Leave to Amend, (ECF No. 54), is **DENIED**, and Defendant Imperium's Motion to Dismiss, (ECF No. 110), is **GRANTED**.   This action is **DISMISSED WITH PREJUDICE**.   Any other pending motions are **DENIED AS MOOT**, and the Clerk is **DIRECTED** to remove this matter from the Court's active docket.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:      June 17, 2026

_____

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE